

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00180-CV

IN THE INTEREST OF R.L.G., JR.,
A CHILD

----------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant R.L.G. Sr. (Father) appeals from the trial court's judgment terminating his parental rights to his eight-year-old son, R.L.G. Jr. (R.L.G.). B.R.C. (Mother) does not appeal from the trial court's termination of her parental rights to R.L.G. Because we hold that the evidence is factually sufficient to support the termination, we affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 47.4.

In part of his issue, Father challenges his affidavit of voluntary relinquishment on the ground of incompetence. In addition to finding that termination of the parent-child relationship was in R.L.G.'s best interest and that Father had executed an irrevocable affidavit of relinquishment, however, the trial court also found that Father had

- knowingly placed or allowed R.L.G. to remain in conditions or surroundings which endangered his physical or emotional well-being;

- failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of R.L.G., who had been in the temporary managing conservatorship of the Texas Department of Family and Protective Services (TDFPS) for not less than nine months as a result of his removal from Father for abuse or neglect; and

- constructively abandoned R.L.G., who had been in the temporary managing conservatorship of TDFPS for not less than six months, and TDFPS made reasonable efforts to return R.L.G. to Father, Father did not regularly visit or maintain significant contact with R.L.G., and he demonstrated an inability to provide R.L.G. with a safe environment.[2]

Father did not challenge these three findings. Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination.[3] We therefore overrule this portion of his issue.[4]

---

[2]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (N)–(O) (West Supp. 2012).

[3]*In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[4]*See* Tex. Fam. Code Ann. § 161.001(1)(N)–(O), (2); *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.).

In the remainder of his issue, Father contends that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights is in R.L.G.'s best interest.

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."[5] "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."[6]

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.[7] We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.[8]

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under

---

[5]*Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

[6]*In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

[7]Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[8]*Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

subsection (1) of the statute and must also prove that termination is in the best interest of the child.[9]

Termination decisions must be supported by clear and convincing evidence.[10] Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[11] Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child.[12]

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own.[13] We determine whether, on the entire record, the factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child.[14] If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant

---

[9]Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[10]Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a) (West 2008).

[11]*Id.* § 101.007 (West 2008).

[12]*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

[13]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[14]Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28.

that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. [15]

There is a strong presumption that keeping a child with a parent is in the child's best interest. [16] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. [17] The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

> (1) the child's age and physical and mental vulnerabilities;
>
> (2) the frequency and nature of out-of-home placements;
>
> (3) the magnitude, frequency, and circumstances of the harm to the child;
>
> (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;
>
> (5) whether the child is fearful of living in or returning to the child's home;
>
> (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
>
> (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;
>
> (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

---

[15]*H.R.M.*, 209 S.W.3d at 108.

[16]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[17]Tex. Fam. Code Ann. § 263.307(a) (West 2008).

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and
>
> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.[18]

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

> (A)   the desires of the child;
>
> (B)   the emotional and physical needs of the child now and in the future;

---

[18]*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[19]

These factors are not exhaustive.[20] Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[21] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[22]

Findings of fact are the exclusive province of the factfinder.[23] Findings of fact entered in a case tried to the court have the same force and dignity as a jury's

---

[19]*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

[20]*C.H.*, 89 S.W.3d at 27.

[21]*Id.*

[22]*Id.*

[23]*Bellefonte Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex. 1986).

answers to jury questions.[24] The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer.[25]

But when findings of fact are filed and are unchallenged, they occupy the same position and are entitled to the same weight as the verdict of a jury; they are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.[26]

In addition to the ultimate findings located in the decree, the trial court also entered the following unchallenged findings of fact,

> 12. The Court finds the testimony of Stephanie Kolb, Adam Soyars, [Mother], Katrina Young, and Amanda Mention to be credible.
>
> 13. [Father and Mother's] relationship was characterized with frequent arguments, involving yelling and screaming, in the presence of [R.L.G.] and [T.M., Father's teenage daughter]. [Father and Mother] engaged in throwing items and breaking items during arguments.
>
> 14. [Father and Mother] engaged in physical fighting in the presence of [R.L.G.]
>
> 15. [R.L.G.] yelled and screamed at [Father and Mother] to stop and would physically intervene during the arguments between [them].

---

[24]*Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

[25]*Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

[26]*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied), *cert. denied*, 555 U.S. 996 (2008).

16.	[Father and Mother] engaged in recurring illegal drug use, including, cocaine, marijuana, and methamphetamines, in the presence of and while caring for [R.L.G.]

17.	Drug use by [Father] began when [R.L.G.] was an infant.

18.	[Father] was aware of [Mother's] recurring illegal drug use; yet, he permitted [] her to care for [R.L.G.]

19.	[Mother] engaged in recurring prescription drug abuse in the presence of and while caring for [R.L.G.]

20.	[Father] engaged in recurring prescription drug abuse in the presence of and while caring for [R.L.G.]

21.	[Father] illegally sold his prescription pain medication in the presence of [R.L.G.] numerous times.

22.	[Father and Mother] experienced instability in their housing situation, moving approximately 20 times with [R.L.G.]

23.	[Father and Mother] depended on family members and community resources to meet their needs and the child's needs.

24.	[R.L.G.] attended numerous schools due to his frequent moves in residences while living with his parents.

25.	[R.L.G.] displayed destructive behaviors while living with his parents . . . .  Those behaviors include[] throwing items; temper tantrums; yelling and screaming; hitting and punching himself; and crying excessively.

26.	[R.L.G.] was diagnosed with ADHD while in the care of his parents.

27.	[Mother and Father] did not provide consistent mental health treatment for [R.L.G.'s] ADHD.

28.	[Mother] overdosed on prescription medication in late December 2009 in the presence of [R.L.G.]

29.	Prior to [her] overdose in December 2009, [Father] was aware of [Mother] abusing various prescription

9

medications and continued to allow [her] to have unsupervised access to [R.L.G.]

30. [B.G.], a brother to [Father], has a history of drug abuse and his parental rights to his own children were terminated.

31. [D.G.], the wife to [B.G.], has a history of drug abuse and her parental rights to her children were terminated.

32. [Father] permitted [B.G. and D.G.] to have contact with [R.L.G.], including staying at his residence overnight.

33. [TDFPS] received a referral on or about January 7, 2010 regarding [Mother, Father, T.M., and R.L.G.]

34. Stephanie Kolb, an employee of [TDFPS], investigated the report and spoke to [Mother, Father, T.M., and R.L.G.]

35. [T.M.] is the daughter of [Father] and the half sibling to [R.L.G.] She was living in the home with [Father, Mother, and R.L.G.]

36. [T.M.] was previously diagnosed with a mental health disorder and had a history of acting out violently. [Father] did not provide consistent mental health treatment for [her].

37. [Father] was diagnosed with Bipolar Disorder in 2008.

38. [Father] admitted to Stephanie Kolb that he was not taking his prescription medication for his Bipolar Disorder.

39. [TDFPS] provided Family Based Safety Services to the family, consisting of [Mother, Father, T.M., and R.L.G.]

40. During the time [TDFPS] was offering Family Based Safety Services to [Father], he began a relationship with Misty Crader. Misty Crader met [Father] after her inpatient hospitalization at Wichita Falls State Hospital, a mental health hospital.

41.	[Father] allowed Misty Crader and her children to move into the residence with him and [R.L.G.] after knowing her for only several weeks.

42.	Misty Crader was at the time and is currently on probation for Injury to a Child for striking her own child.

43.	On September 30, 2010, [Father and Mother] agreed to an Order to Participate in Services. The order prohibited [Father] from permitting Misty Crader contact with [R.L.G.] unless approved by [TDFPS].

44.	On October 1, 2010, [Father] permitted Misty Crader to have contact with [R.L.G.]

45.	On October 6, 2010, [Father] and Misty Crader discussed with Katrina Young the process to withdraw a child from the school district and transfer the child to Missouri schools.

46.	[TDFPS] removed [R.L.G.] pursuant to court order under Tex. Fam. Code §262.102 on October 6, 2010.

47.	An adversary hearing was held on October 29, 2010. [Father and Mother] appeared in person and with counsel. The Court entered temporary orders appointing [TDFPS] as temporary managing conservator of [R.L.G.] and made the requisite findings under Tex. Fam. Code §262.201.

48.	On October 29, 2010, the Court entered temporary orders that specifically established the actions necessary for [Mother and Father] to obtain the return of [R.L.G.]

49.	On October 29, 2010, [Father] was ordered by the Court to participate in the following services:

a psychological evaluation and follow the recommendations of the psychological evaluation;

participate in individual counseling and follow any and all recommendations and continue until no further sessions are necessary;

participate in a drug/alcohol assessment and follow any and all recommendations;

participate in parenting classes until completion;

submit to drug testing at the request of [TDFPS]; and

to participate in an intake/ evaluation at Denton County Mental Health Mental Retardation for treatment of his Bipolar disorder.

[Mother] was ordered to participate in substantially the same services.

50.	[Mother and Father] were court ordered to establish and maintain safe and suitable housing and refrain from engaging in criminal activity.

51.	[Mother and Father] were court ordered to establish and maintain suitable employment for a period of at least six months and continue through the pendency of the suit.

52.	[Father] was ordered to have two visits weekly with [R.L.G.] [Father] missed over half of his visits with the child over the pendency of this case.

53.	[Father] has not regularly visited or maintained significant contact with [R.L.G.]

54.	[TDFPS] established counseling, parenting, drug treatment services, and a psychological evaluation for [Father] in Texas.

55.	[R.L.G.] was returned to the care of [Mother] in June 2011 and the Court modified the temporary orders under Tex. Fam. Code §263.403. In November 2011, [R.L.G.] was removed from the returned care of [Mother] after her overdose on prescription pills and the Court modified the temporary orders and established a new dismissal date.

56.	[Father] moved several weeks after the adversary hearing out of state to Missouri with Misty Crader. [Father] moved residences multiple times during the case.

57. [Father's] plan for [R.L.G.] includes living with Misty Crader and her children. Misty Crader's daughter has a history of mental health hospitalizations and acting out aggressively.

58. Misty Crader has a history of marijuana use. Misty Crader has a history of not taking her prescription medication for treatment of her Bipolar Disorder. Misty Crader has a history of suicide attempts. Misty Crader has a prior history with [TDFPS]. Misty Crader has prior criminal charges involving assault in Missouri.

59. [Father] threatened suicide in February 2012 and had a suicide plan developed.

60. [Father] has demonstrated an inability to provide [R.L.G.] with a safe and stable environment.

61. [Father] did not successfully complete all of the services . . . which the court ordered.

62. [Father] has not been employed since approximately 2008. [He] has no independent means to support a child.

. . . .

66. [TDFPS] made reasonable efforts to return the child to [Father and Mother].

67. [TDFPS's] plan for [R.L.G.] is adoption by a non-relative.

68. [R.L.G.] has appeared happier and less anxious since placement in his new foster home.

69. [R.L.G.] needs a safe and stable environment to thrive emotionally.

. . . .

13

The record contains evidence to support all of these unchallenged findings; accordingly, we are bound by them.[27]

Additionally, Mother, who voluntarily relinquished her rights, testified that she had learned that children with ADHD need structure and that she did not believe that Father could give R.L.G. that structure because "[Father] always puts himself first. He never thinks of [R.L.G.] A good example, he moved to Missouri instead of staying in Texas." Mother also testified that she believed that Father's parental rights to R.L.G. should be terminated "[b]ecause he cannot provide for [R.L.G.] mentally, physically, [and] stably." She stated that she and Father "both do more harm to [R.L.G.] than good [and] always have." She further stated that it would not be in R.L.G.'s best interest to be with Father because, in her opinion, Father could not provide for him, would not appropriately supervise him, chose to leave him with inappropriate caregivers, and was not always protective of him. She also did not believe that Father would be vigilant enough to make sure that R.L.G. took his medicine properly.

Mother testified that "since [R.L.G. has] been placed in the foster home that he's in now, he's a lot happier. He's less anxious. He talks about his foster dad all the time. He's very comfortable with him. And [she] believe[s] [that R.L.G. is] finally getting the support and stability that he needs." She also testified that she believes that R.L.G. "wants to remain in the custody of his foster parents." "He talks about

---

[27]*See McGalliard*, 722 S.W.2d at 696; *Rischon Dev. Corp.*, 242 S.W.3d at 166.

[his foster dad] all the time. He's very happy. He calls him dad. He needs structure. He's getting structure."

Consequently, reviewing all the evidence and giving due deference to the trial court's findings, we hold that the evidence is factually sufficient to support the trial court's best interest finding.

We overrule the remainder of Father's sole issue and affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: September 20, 2012